Good morning, Your Honor. Eric Slotkin on behalf of Kanika Revels. I'm going to attempt to reserve Tony a minute to rebuttal. Your Honor. Good morning. This is a Social Security claim, and we ask that you vacate the final decision of the Administrative Law Judge denying Ms. Revels benefits based upon legal error, as well as ALJ findings that are not supported by substantial evidence of record. First, I'm going to talk to you about the ALJ's handling of symptom testimony and its finding that Ms. Revels was not fully credible. I would point you to the holding in Brown Hunter v. Colvin at 806 F3D 487, as well as SSR 16-3B. In Brown Hunter, it states that an ALJ's error in credibility determination is usually not harmless. In this case, we have a concession that the Administrative Law Judge's credibility determination included error. Specifically, the ALJ found Ms. Revels not credible because he claimed there was inconsistent reporting regarding marijuana use. The reporting was that she split a joint at age 33, and as noted, it is not inconsistent with her trying marijuana one to three times in June of 2011 in terms of being relieved. The fact that the Administrative Law Judge found there was an inconsistency in belief that Ms. Revels wasn't being truthful appears to have tainted the entire process. I think what happened to his decision was she reported pain that was 10 out of 10, and that's as severe as the doctor tells patients, which would be 1 to 10, 10's as severe as pain gets, and that that was inconsistent with their daily activities. I thought that was the basis. What the judge found was that there was inconsistent testimony on a separate issue regarding the pain reporting, believing that pain could not have been consistently reported at 10-10. For the reasons you've stated, we pointed out in the brief that Ms. Revels' pain was not consistently reported as a 10-10. And that that was an error in finding that she could not have static 10-10 pain when the record didn't reflect it, and that was a tacit admission by defendant when they concede additional error when the Administrative Law Judge wrote that treatment improved pain, and that was one of the reasons why he didn't believe Ms. Revels on her pain reporting. The commissioner agrees that treatment... I didn't say anything that you didn't believe. You thought he exaggerated. Well, he doesn't use the term exaggeration, but I do believe he questioned disparity. But the commissioner agrees that Ms. Revels didn't always report 10-10 pain. They agree that that was an erroneous finding. The commissioner agrees that the Administrative Law Judge found that treatment improved pain. And overall, and that based on that, the Administrative Law Judge concluded that Ms. Revels can do a range of legwork. But the commissioner agrees that that's wrong. The treatment didn't reduce her pain significantly, and the records don't reflect that. She has fibromyalgia, and I don't believe there's a debate here that that was diagnosed and that that was accepted, that she has that condition. And it was my understanding, and again, kind of the problem I'm having here, is that the ALJ who saw her and heard her testimony, and because there are not a lot of objective findings really for this, but rather her recounting of her pain and her discomfort and her ability to function, is really important to the determination of a level of the severity of her disability. And he found, based on her testimony, he talked in person and saw her not credible, that she did say she had 10 out of 10 pain. She said she couldn't use her hands, which was contradicted by objective facts. So why can an ALJ not discount the testimony that they take live and in person and are weighing and judging? Because they disagree that the person's being credible and honest and that we should just have to say, well, she said it, so it must be so. A number of reasons. First, the claimant did not state that her pain was tempted and adherent. The other is when you look at her reports about her pain, she says she can do light cooking, light cleaning, light shopping, and we have to take in how people communicate, and we can't take everything somebody says literally. When I say I don't sleep at night, it doesn't really mean I don't sleep at night. It means I'm having trouble sleeping now. But he was there and talked to her and heard her testimony. I mean, I'm looking at a record here and being told, well, what she really meant when she said that was this or that. And the judge who's there, you know, addressing the credibility of a witness is hearing that person's testimony. And now I'm kind of second-guessing what she really meant when she said those things. No, we don't need to second-guess. All we have to do is look at her testimony. She said she uses her hands to do things. She drives. She does things around the house. These are things you have to use your hands for. She readily admits it. Yes, she has a lot of hand pain. Yes, it's difficult for her to use her hands, but she's not hiding anything from the judge. She's telling the judge exactly what she can and cannot do with her hands. And when you look at this record, she was forthright. I mean, he asked the question and he gave her the answer. And so, you know, when somebody says, I can't use my hand, and you follow up and you say, well, what do you do with your hands, and you say, I can do some light cooking, I can do laundry, you don't walk away with an impression that that person can't use their hands at all. Even if she said she couldn't even use a phone? She said she has difficulty using her phone for long periods of time because it's hard for her to hold her hand in any one place for that long of a period of time. She didn't say she cannot use her phone. She said it's difficult to use her phone. And she talked about how long she can use her phone for. And when we look at the entire evidence, but, you know, we have to look at what the administrative law judge said. If you find that just one of those reasons were clear and convincing, that doesn't mean you get to affirm the decision of the administrative law judge. In Brown Hunter, this court initially said that when an ALJ errs in weighing credibility, it's always reversible error. It's never harmless if it goes forward. And then the commissioner moved for en banc review, saying, well, it shouldn't be never because there may be some exceptions. And the commissioner was right. And the Brown Hunter was revised to state it is usually not harmless error. And so when we look at this as a whole, the administrative law judge rejected symptoms for a reason that every single circuit court has found to be error. Specifically, there's not enough objective evidence. So, wait a minute, let's sort out the different things. It used to be that some doctors thought there was no such thing as fibromyalgia. And some social security administrative law judges thought there was no such thing. Other doctors thought there was such a thing. And other ALJs thought there was such a thing and that it could be totally disabling in some cases. And that issue was settled by ruling was in 122P or something like that, where the Social Security Administration recognized it. Here, I don't actually see why that's an issue because the Social Security Administration didn't accept that you had fibromyalgia and that it was a disabling condition. Because the other aspect of the rationale provided by the administrative law judge is that her fibromyalgia is not disabling because there's normal range of motion. Well, the issue before 122P was that an ALJ said there's no fibromyalgia because there's no objective medical evidence that proves there's fibromyalgia. And that's now out dead because of ruling 122P. But that was not the basis. The basis for rejecting her claim was that she was, according to the ALJ, exaggerating how severe her condition was. Again, I'm going to take issue with the term exaggeration. But 12-2P does not say what you've indicated in your question to me. So let me address that specifically. 12-2P that says objective data is going to be the signs and symptoms. And that's an actual evidence. You don't need to answer some more here. According to 12-2P. And what the ruling says is we are going to look at those signs and symptoms, those subjective complaints, and consider that to be the objective data. Because the 2010 ACR criteria and the 1998 ACR criteria specifically provide for that. As does the medical literature that we cited. I see the 11 gender points as one of the things that the ALJ is supposed to look at in 12-2P. That's the 1990 ACR criteria. But if you read a little further down in 12-2P, they talk about the 2010 ACR criteria. And in both, when discussing both the 1990 and the 2010 ACR criteria, they recognize that the signs and symptoms, the objective data, is exactly the complaints that the judge has dismissed it. He is not following that policy forward. When he says it's normal range of motion, it does not matter. 5.1 ALJ does not cause abnormal range of motion. 12-2P is specific on this, as is both the 1990 and the 2010 criteria. And so when you look and you put all these errors together, I would point you to the own journey where we can't substitute our judgment for the administrative lawyer judge's findings. He made errors of that and errors of law. And it's like the straw that broke the camel's back. If he thought all these things were true that weren't true, and then we add on one more thing and he says, okay, she's not credible, what happens if he knows that two of those reasons weren't supported by the record? Or three of those reasons weren't supported by the record? We don't know what his ultimate credibility finding would have been. And so we cannot speculate that just because one of those reasons may be sufficient that the claimant is therefore not disabled because if the judge realized that the four other reasons weren't clear and convincing or specific and legitimate, he might have not come to that conclusion. What about the treatment of Dr. Nolum? Was he a treating physician? Dr. Nolum was a treating physician. He's rendered numerous opinions. He's explained in detail his findings and his opinion. He went through the course of treatment and he rendered an opinion. Now, the predominant reason for rejecting that opinion, again, falls back on SSR 12-2P. The Administrative Law Judge believes that if you have normal range of motion, normal reflexes, that the doctor's opinion can't be reasonable. That's what he's writing. It's just simply not correct. I would like to point out, if you look at the treatment, she's had MRIs. First, she's had the positive physical examinations noting more than 11 out of 18 positive tender points meeting the 1990 criteria. She's had six or more signs and symptoms of the 2010 ACR criteria. She's had an MRI that reveals disc degeneration in the cervical area, as well as a lumbar disc herniation that contacts the inferior aspect of the left L-site, S1 nerve root sleeve, within the neuroforamen and conjoined nerve root sleeves. She's been treated with injections, physical therapy, mental health counseling, or a splint, a tange unit. She's been prescribed aplophenic pain patches, Soma, Valium, Vicodin, Robaxin, Tracidone, Neurotin, and Percocet. She's had epidural injections. Now, when we look at Dr. Nolan's opinion, the judge classifies that as conservative care. They took needles, they put it into her vag, and if we look at Garrison, I don't think they ever did understand their point. I mean, it depends a lot on the disease. In many diseases, doctors call non-surgical care conservative care and surgical care aggressive care. And it just depends on the disease. In some diseases where there's a choice of medications, some medications will be called conservative and others aggressive. I don't understand why this can't properly be termed as the way the doctor termed it. So we have to look at two different things when we talk about conservative care. One is how the medical community looks at it, and one is how the legal community looks at it. Because if you go into a hospital and you have an angiogram, and you have stenting, and they didn't do a bypass surgery, cardiologists may list that as being conservative. That's right. But they might say, if you have total degeneration of a knee joint, and the doctor says, look, before we go and do a total knee replacement, we're going to try osteoscopic surgery, that doctor's calling it conservative. But in the legal community, we talk about what is the impairment and what has been done for it. I don't really care whether doctors would call it aggressive or conservative. What matters is it totally disabling for doing any work in the national community. So we have to separate that out. As an aside, I'll give you a personal example where my niece has a brain tumor, and they've decided that they're going to treat it conservatively by removing only three quarters of it instead of 100 percent of it. It still is too much. She's totally blind. But the doctor called that a conservative option for this individual. And so in the legal community, we would have never considered that. It doesn't matter whether you call it conservative or aggressive. Those are doctor's terms that just don't matter to legal decisions. That's right. And when we look at Carmichael, they talk about a prescription of wellness as being non-conservative care. It's a prescription medication. And you're right. It's going to depend upon what your impairments are. For Ms. Gravel's impairments, this was very aggressive, non-conservative treatment. And I think greater weight should be given to the opinion of a rheumatologist. Sir, it seems to me that under the new version of 12-2P, one of the three things is to have to provide other possibilities. And often the way doctors rule something out is by giving the patient a medication, seeing if it works. And if it doesn't work, they pull it out to a condition that would work for it. For example, if you have a suspected heart attack, the one nitroglycerin under your tongue, it is easier to feel better. And if you don't, it's evidence against the heart attack. I'm not sure how that applies in the fibromyalgia. Fibromyalgia could well have been giving her those medications to rule out other conditions rather than fibromyalgia. It could be causing her pain. I believe there was one medication trying to see if it may have been more arthritis than fibromyalgia. But every other single medication prescribed for Gravel's was for the purpose of pain relief. It was not diagnostic. It was, we're going to try this, we're going to try this, we're going to try this. And I want to make a point on this. It's not a rule-out diagnosis. I know some judges have that opinion. 12-H2P says it's not a rule-out diagnosis. If an individual has fibromyalgia and then they have a car accident and they herniate a disc, that does not mean their fibromyalgia is cured, even though much of the pain may now be due to a car accident. What 12-H2P states is that it has to explain the symptoms. So if, let's say, she has a herniated disc and that doesn't explain the symptoms she's getting in her lower extremities or in her arms or her whole body pain, then that herniated disc doesn't explain all of the pain. It only explains part of the pain. And so under the SSR ruling, it's still fibromyalgia. You still have to evaluate it as under the fibromyalgia provisions. It is not a rule-out diagnosis. All right. Thank you, Jens. Thank you. Thank you. May it please the Court, the Court is called. Lars Nelson, on behalf of the Commissioner of Social Security, is called to affirm the decision of the ALJ because it is supported by substantial evidence in this manner. I'd like to first clear up the issue of harmless error. It is well-settled in the lean and viastro that there is no per se harmful presumption. The ALJ can make errors. The Commissioner can argue harmless error. The Commissioner conceded an error in this manner, but it's harmless because there is substantial evidence. Did the Commissioner concede that? The Commissioner conceded marijuana as a credibility determination, and the Commissioner conceded that to the extent it's interpreted as just being a blanket claimant improved totally after the injections.  She still experienced pain. So when you found the treatment of the treating rheumatologist, are we discounting all of his findings? The ALJ discounted all the findings? Yes. And there's multiple opinions by the treating doctor, no matter. And it's unfortunate in this case that the ALJ was confronted with records of obtaining plenty of evidence. Well, isn't it true? I mean, as this guidance talks about how, I mean, this is the problem, I mean, with your cases and the ALJ's opinion, that the symptoms of fibromyalgia wax and wane. It's not a constant, and that you have some good days, some bad days, and that, in fact, someone who has that disease could actually appear to be perfectly normal, but could be suffering through scrutiny, pain. And so you would expect to see changes over time, especially without the treatment that this particular person is getting through you. Well, I guess I'd like to address, I think there's two issues there. There's one, just the treatment of Dr. Nolan's opinion, and then the other, the wax and waning all the time. And I would say that Dr. Nolan's opinion in this case, it's not Dr. Nolan's opinion at fault that he might have overstated her limitations. On 7-62 on the record, the claimant told Dr. Nolan that she can't do anything because of her hand pain, without qualification. However, there's another training opinion in this record, and that's from Dr. Regheri. And Dr. Regheri, on 4-87 and 4-88 of the record, is well aware of the diagnosis of fibromyalgia. When he's examining Ms. Nelson's hands, he specifically looks at the injection points by Dr. Nolan to make sure they're okay. The claimant told Dr. Regheri, however, that she was independent in her daily activities, these take a little bit longer. And Dr. Regheri actually performed a more detailed examination of the claimant than just Dr. Nolan's. It wasn't that Regheri was the hand specialist. Nolan was a rheumatologist. Fibromyalgia is a rheumatic disease. I don't understand why Regheri's examination of just her hands under the description of fibromyalgia could look perfectly normal. It could be used sometimes to do certain things, but it could also be, at other times, having a lot of pain. Like, yeah, it would take precedence over her treating the disease. Well, she told the diagnostics at the age of about the extent of her pain. There were different specialists. I'm sure you've had that experience where going to specialists, in order to be human, is they think that specialists, specializing doctors, think that there's a little part of your body that they're a specialist and just think the most important thing is your health, your well-being. So, I mean, it seems like you would give more weight to someone if you had the expertise and the nature of the disease as opposed to, like, letting it dislocate a little part. Well, the treaters' regulations in SSR 12-SGP don't give any doctors a blank check. But you do have other, you have a blank check, but you do have another line that talks about how you treat each of these categories of physicians. Absolutely, Your Honor. And there's a lot of blanks in there. Yeah, you can't find them right now, but I know you have a rolling that goes through each type of physician and what kind of weight and how, but you're not going to give away what kind of explanation you have to give for that. Yes, those are the regulations that apply to this case. The commissioner has since published New Orleans' effective margin this year. Those get devoured. But those are only effective to claims going forward. And how do they do away with what? With the hierarchy, with the preference for treating and things of that nature. But, yes, the court is accurate in describing the regulations as they applied. And expertise is about one factor amongst many. And the ALJ had to look to the extent to which the opinion was also supported. And for doing that, the ALJ, under SSR 12-SGP, in the section that specifically goes to the question of how do we assess residual functional capacity in a fibromyalgia case, says we need a longitudinal record because we acknowledge symptoms waxed plain, but the ALJ has to consider the record as whole. And here the ALJ had a record with daily activities that were significant and did not wax plain. She's describing in 2008 I think the issue on daily activities for us is likely to be, well, everybody has their daily routines, and the worse they feel, the harder it is to perform them, and the longer they take, and the better you feel, the more efficiently you can perform them. It's not as though there's these stinking lawnmowers or snow machines inside the back of our pickup truck. Yeah, it's the kind of stuff where people can do it even when it's hard. And so why doesn't that show that there's no consistency of significance between everyday activities and the symptoms of fibromyalgia? That's what you're up against. I don't really understand quite what your answer is to that. Well, it's going to depend on the case. One, the easy ones. One, in any case, when you have daily activities, it's going to depend. In some cases, we have daily activities that improve using memory. And then in other cases, there might be one activity, I like Fairview Bulletin, which hypothesizes the activity of running marathons, and they say if we plan to run marathons, we don't need to do anything else. But there's two lines of authority. There's one, we have activities that improve functioning, and then we have, as it relates to evaluating specific sites. Sure, that part's easy. If somebody says my right arm's paralyzed, and they've got a picture of them jacking up their car to change the tire, that proves their right arm's not paralyzed. But these daily activities things show me why that proves that you can still do some work in the national economy and that there's credibility and determination, at least as far as exaggeration is concerned. Well, it's not the commissioner's burden to show that her activities prove she can do work. The claimant's burden to show that her complaints are credible. You're right. And she's a substantial evidence on the record as a whole test. But still, if you didn't have to bear the burden, what would you say? For this case, if I did have to bear the burden then I would say the VLJ was right in reaching its determination because Ms. Ruffles just wasn't very useful as witness in resolving this case. And that's because there is such a huge chasm between her testimony at 58, on the record, that her pain is like being stabbed with a screwdriver, and yet her ability to go through her daily life and take care of children, to mop, to vacuum, to drop them off and pick them up from school, make dinners for the family, that that bridge just cannot be rectified. This screwdriver, is that all the time or just it's been that way once or what? She says it's always there. And that's on 58. On 57, she describes the pain as all over. And she says that this pain comes from, I believe it's 58, just living a daily life. She also says she's tired all the time. That's at 58. She's 60. So this is not claiming who was a political eye at her hearing, but what her level of pain was. She was a phlebotomist, so was the abscissist on the hand issues because that was basically what she needed for her employment was to be able to use her hands. And so the testimony that she found it difficult to hold a phone, which was not found to be credible given the other things she said she could do, is that relevant then to the determination as to whether she can function in the economy? Well, we don't have to show here. It's on 74, whether she can keep her pass or not. Right. And the outdate found that she could keep her pass. Yes, ma'am. Let's see. That's very interesting. If you look at her testimony, page 56, it seems as though that's the particular thing she really can't do is draw blood. And that was the main factor why she ended up taking that job because she, you know, having a needle and specimens and the patient and tackling all of that with the pain that she had in her hands. And she just, that's the one job she just really can't do. I mean, it's something that would be more possible to me, based on all your other arguments. If she did, she could go back and draw blood, but maybe she could, I don't know, babysit. You know, or I don't know. I mean, it's just that particular finding I just found very implausible because I'm not sure I'd want her drawing blood. I can appreciate the court's concern. This wasn't just a fibromyalgia case. There were other impairments. I heard that phrase. Yes, ma'am. She had a needle on the floor and she couldn't do that. Yes, and DLJ, I see I'm out of time. So I could just... I gave you, I've got some time. You can answer the question, make your point. The point that I would rest on is that there was a hand specialist. And not only was there a hand specialist, there was a state agency doctor who had the benefit of not only Dr. Nola's reports, but a hand specialist, Dr. McGarry's reports, the constitutive examiner, Dr. Coney Ham's reports, and that Dr. Rouse, the state agency doctor, and at 116 of the record, Dr. Rouse was identifying limitations. So this was not just a hand specialist versus a fibromyalgia doctor. In most cases, I mean, it would still be the commissioner's position that substantial evidence, specifically if there's three state doctors, and two of them support DLJ's decision. But that's just not what the case is here. It's that there's a special hand doctor who is well aware of fibromyalgia, performed more detailed testing, and then ultimately concluded she should go pursue gainful work. But there was a state agency doctor who looked at that opinion and wasn't able to assess specific manipulative limitations to account for her pain and her fibromyalgia and other symptoms that were in direct conflict with her past work. Because of the finding of residual capacity, was a vocational expert brought in in this case? Yes, I think there was vocational testimony in this case. That support helps support DLJ. It's not required to support, but I believe that DLJ helps. They helped find some funny occupation. You've never heard of it. You can speak to how much fun did they find in this case? Well, this was her past work as a phlebotomist. But yes, there we certainly see funny jobs. All right. Thank you, guys. We'll give you another minute. Thank you. Thank you. I appreciate the generosity. Let me talk quickly about Dr. Nolan. The commissioner says that he was misled because the claimant said, she can't do anything. Let's look at Dr. Nolan's opinion. He says she could sit less than three hours and stand less than three hours, more than two, less than three. And so Dr. Nolan didn't say she can't do anything. He's limited to her range of part-time work. Now, they say, well, that's in conflict with the opinion of Dr. McGarry. No, it's not. Dr. McGarry said she should try some type of work. Social Security says you should try to work if you can, and they provide for unsuccessful work attempts. But let's put that on the side. Dr. McGarry didn't say whether Ms. Raffles can use her hands consistently, constantly, frequently, occasionally, nothing. So we don't know. The vocational experts who did testify at the hearing said that if she were limited to even occasional hand use, she couldn't do her best work. Not just Dr. McGarry doesn't talk about sit, stand, walk, lift, carry. If you look at SSR 96-5P, this type of an opinion isn't really entitled to much weight. I'm releasing it back to work. Because it's nonspecific and the policy ruling specifically states that. Now, they say Dr. Cunningham's opinion conflicts, but it doesn't. Dr. Cunningham found findings and diagnosed fibromyalgia without gender points, absolutely appropriate under ACR 2010 criteria. He didn't assess any restrictions. So it didn't conflict. He just said there are no limitations. That's clearly not supported by this record. The judge didn't find it. It doesn't conflict. And then Dr. Rouse, they're looking at. Dr. Rouse says, I don't see confirmation of fibromyalgia gender points. I don't think she has fibromyalgia. Totally wrong. And so you can't rely on those opinions and find they conflict with the opinion of the treating rheumatologist who explained and explained what was going on. And multiple opinions, letters, and they say it's conclusory. And if we look at Garrison, I mean, there's no question that this was a very detailed finding in terms of what Dr. Nolan was wrestling on when he rendered his opinions. And just quickly with the activities of daily living, every report she's made says it takes longer to do everything that I do, and I need to stop and rest. It's a consistent theme throughout this entire record. All right. Thank you, counsel. Thank you, and thank you for the extra time. Okay, and I'll defer to Rebels for securing our case.
judges: Kleinfeld, Wardlaw, Bencivengo